UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 06-CR-232 (JFB)

UNITED STATES OF AMERICA,

versus

CHUNON L. BAILEY,

Defendant.

MEMORANDUM AND ORDER
September 6, 2006

JOSEPH F. BIANCO, District Judge:

Defendant Chunon Bailey was indicted on April 6, 2006 in three counts, all relating to the events of July 28, 2005. Count One charges that Bailey possessed with intent to distribute at least 5 grams of cocaine base, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(iii). Count Two charges Bailey with being a felon in possession of one or more firearms, in violation of Title 18, United States Code, Section 922(g)(1). Count Three charges Bailey with using and carrying firearms in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

Bailey has moved to suppress physical evidence and statements obtained on the day of his arrest, arguing that: (1) the police had no authority to detain him, pursuant to the execution of a search warrant at a residence, once they allowed him to leave the immediate area of the residence that was about to be searched; (2) any statements made during that detention were obtained in violation of his constitutional rights because the officers failed to advise him of his rights under *Miranda v. Arizona*, 383 U.S. 486 (1966); and (3) the police had no authority to seize his keys during such detention. On July 27, 2006, the Court heard argument on Bailey's motion and, on August 2, 2006, the Court conducted an evidentiary hearing regarding the motion. For the reasons that follow, the motion is denied.

I. FACTS

The two law enforcement officers who detained Bailey on the day of his arrest testified at the hearing. Bailey called no witnesses. After evaluating the credibility and demeanor of the witnesses, and the other

evidence offered at the hearing, the Court makes the following findings of fact.

On July 28, 2005, the Suffolk County Police Department obtained a search warrant, issued by Judge Lotto of the First District Court in the Town of Islip, New York, authorizing the search for a .380 handgun at the rear basement apartment (hereinafter, the "apartment" or "residence") in a house located at 103 Lake Drive, Wyandanch, New York. In connection with the search, the officers executing the search warrant had a general description from an informant regarding the individual who occupied that apartment - namely, "a heavy set black male with short hair" and the name "Polo." (Tr. 15-16, 49-50; Ex. 1.)[1]

The search warrant was executed later that evening. At approximately 9:56 p.m., shortly before the execution of the search warrant, Suffolk County Police Detectives Richard Gorbecki and Richard Sneider were in an unmarked vehicle outside the residence conducting pre-search surveillance and observed two individuals (one later identified as defendant Chunon Bailey) leave the gated area that leads only to the basement apartment and enter a black Lexus in the driveway of the residence. Both individuals matched the general physical description provided by the confidential informant in connection with the search warrant. For safety reasons, including a desire to avoid having the defendant potentially alert others in the apartment to the presence of law enforcement, the detectives did not detain the two individuals in the driveway or in sight of the residence; rather they let them drive away and followed the black Lexus for approximately one mile (which took less than five minutes) and stopped the car in the vicinity of the Wyandanch Fire Department. In particular, the detectives were concerned that, if any people who remained inside the residence saw that individuals leaving the residence were being stopped, they could arm themselves or destroy evidence prior to the search. (Tr. 15-18, 51-54.)

The detectives explained that they waited about one mile to stop the car rather than detain them immediately to prevent people in the residence and people passing down the block going to the residence, from seeing them stop the car. In addition, once the Lexus was off the block and they were able to get directly behind the vehicle, they were located at a busy intersection and, rather than conduct the stop at that busy intersection, the detectives decided to wait until the Lexus turned off that busy road and then conducted the stop at the firehouse. At no time while the detectives were following the Lexus was the Lexus out of the detectives' sight. (Tr. 19-20, 37, 39, 54.)

After the car was stopped by the detectives, the two occupants were told to step out of the vehicle and to go to the back of the car. They were then patted down to determine if they possessed any weapons. The detectives were particularly concerned about weapons given that the focus of the search warrant was a handgun. As part of the pat-down, hard items were removed from their person including, as to Bailey, his keys on a key ring (including the key to the car) in his front left pocket and his wallet in his back right pocket. Those items were placed on the trunk lid. No weapons were found. (Tr. 21-24, 55- 56, 59.)

---

[1] "Tr." refers to citations to the transcript of the August 2, 2006 suppression hearing and "Ex." refers to exhibits admitted during that hearing.

2

At the back of the car, Detective Sneider conducted an identification inquiry as to Bailey, who was the driver of the car. Specifically, he asked Bailey who he was and Bailey stated his name. Sneider then asked where Bailey was coming from and he responded that he was coming from his house. When Sneider asked Bailey for the location of his house, Bailey stated that it was 103 Lake Drive.[2] Sneider then asked Bailey for identification and Bailey took his license out of his wallet and handed it to Sneider. Looking at the license, Sneider noticed that the address was not 103 Lake Drive in Wyandanch, but rather was a Bayshore address. The fact that the license showed Bayshore as his town of residence was significant to Sneider because the confidential informant, who had provided information to the detectives in connection with the search warrant, had stated that the person from whom he had bought narcotics had lived in Bayshore prior to living at 103 Lake Drive. (Tr. 25, 56-57.)

After conducting the identification inquiry, Bailey and the other occupant of the vehicle were handcuffed for safety reasons to be transported back to 103 Lake Drive and detained during the execution of the search. After being handcuffed, Bailey asked why he was being arrested. In response to Bailey's inquiry, Detective Gorbecki advised him that he was not under arrest, but that he was being detained in connection with a search warrant that was about to be executed at his residence. Bailey then stated that he was not cooperating, he does not live there, and anything found there was not his. (Tr. 26-27, 45, 58-59.)

The detectives contacted a patrol car to transport Bailey and the other occupant back to the site of the search at 103 Lake Drive. The wallet was returned to Bailey's pants, but the keys (which contained five or six keys, including the key to the black Lexus) were used by Detective Gorbecki to transport the car back to the scene of the search. Uniformed officers drove Bailey and the other individual back to the scene of the search and, as the officers arrived back at the search, they were advised by the entry team that there was a gun and drugs in plain view in the apartment.[3] At that time, Bailey and the other individual were placed under arrest and the keys on the key ring were not returned, but were seized incident to the arrest. At some point on the evening of the search of the apartment, a key on Bailey's key ring (along with the car key) was tested and fit the door of the searched apartment and, at that time, the key and lock were seized for evidence. (Tr. 27-29, 59-60.)

II. DISCUSSION

Bailey argues that his detention during the search of the residence was a violation of the Fourth Amendment and, thus, the evidence recovered as a result of that detention, including the key to the residence where contraband was recovered and his statements to the police, must be suppressed. More

---

[2] The other occupant of the car was also patted down and asked his name, as well as where he was coming from, by Detective Gorbecki. After providing his name, this individual stated that he was coming from the house of his friend, Chunon Bailey, and was on his way to his home at South 18th Street in Wyandanch. He also stated that he was on parole, had a 10:00 p.m. curfew, and Bailey was driving him home for that curfew. (Tr. 23-24.)

[3] A total of less than ten minutes elapsed from the time Bailey was pulled over until he was returned to the search site. (Tr. 28.)

specifically, Bailey argues that: (1) the police did not have a lawful basis to stop him once he left the area of the residence that was about to be searched; (2) even if they had a lawful basis to stop him, his statements to the police without *Miranda* warnings violated the Fifth Amendment; and (3) the seizure of his keys during the stop violated the Fourth Amendment. As set forth below, the Court finds these arguments to be without merit and denies the motion. The Court will address the issues in turn – the car stop and detention, the statements, and the seizure of the keys.

### A. Stop of Bailey's Car and Bailey's Subsequent Detention

Although Bailey argues that the stop of his vehicle violated the Fourth Amendment, the Court finds that the stop and his subsequent detention were lawful as a detention during the execution of a search warrant, under *Michigan v. Summers*, 452 U.S. 692, 705 (1981), or, in the alternative, as a lawful investigative detention, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

#### 1. Detention During Search of Residence Under *Summers*

It is well-settled that, regardless of individualized suspicion, "officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. at 705). In *Summers*, the Supreme Court reasoned that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." 452 U.S. at 704. The Supreme Court has articulated three legitimate law enforcement interests that provide substantial justification for detaining an occupant during the search: (1) "'preventing flight in the event incriminating evidence is found'"; (2) "'minimizing the risk of harm to the officers'"; and (3) "facilitating 'the orderly completion of the search,' as detainees' 'self-interest may induce them to open locked doors or locked containers to avoid the use of force.'" *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 702-03); *see also Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991) ("Absent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion.").

In the instant case, because Bailey was observed leaving the basement apartment at 103 Lake Drive that was about to be searched pursuant to a warrant, the police had the legal authority under *Summers* to detain Bailey for a reasonable period during the execution of the search. Bailey argues that *Summers* and its progeny are inapplicable to the instant case because Bailey was not detained at the residence, but rather was followed a few blocks by police from the residence before he was detained. The Court disagrees. Both the Supreme Court and the Second Circuit have found that the authority to detain an occupant during a search applies even when the occupant is found and detained outside the residence. *Summers*, 452 U.S. at 702-06; *United States v. Fullwood*, 86 F.3d 27, 29-30 (2d Cir. 1996). More specifically, in *Summers*, policemen arriving at defendant's residence with a search warrant encountered the defendant while he was descending the front steps and detained him during the

4

execution of the search of the residence. 452 U.S. at 693. In upholding that detention, the Court emphasized, "We do not view the fact that [the defendant] was leaving his house when the officers arrived to be of constitutional significance. The seizure of [the defendant] on the sidewalk outside was no more intrusive than the detention of those residents of the house whom the police found inside." *Id*. at 702 n.16. Similarly, in *Fullwood*, as the officers arrived to execute a search warrant at a residence, the defendant was outside the residence entering his vehicle. 86 F.3d at 29. The Second Circuit held that "[i]t was permissible for the officers to require [the defendant] to reenter his home and to detain him while they conducted a search of the premises pursuant to a valid search warrant." *Id.* at 29-30.

Bailey argues that the key difference between the instant case and *Fullwood* is that, instead of detaining Bailey immediately outside the residence when they saw him enter his car (as in *Fullwood*), the police here followed Bailey a few blocks before detaining him and bringing him back to the search location. The Court does not view this factual distinction to have any constitutional significance under the facts of this case and concludes that the holding of *Fullwood* controls.

At least two of the law enforcement interests articulated in *Summers* applied here – namely, prevention of flight should incriminating evidence be found during the search and minimizing the risk of harm to the officers. *See Leveto v. Lapina,* 258 F.3d 156, 167 n.15 (3d Cir. 2001) ("A detention [under *Summers*] may be reasonable even if fewer than all of these law enforcement interests are present."). As both detectives testified at the hearing, they wanted to detain Bailey as he left the residence pending execution of the search, but did not do so immediately because of concerns about the effect that such a detention would have on officer safety, as well as the potential destruction of evidence. Instead, they followed him a short distance – approximately one mile or less than five minutes – and then detained him at the first spot where they determined it was safe to conduct the stop. The defendant's car never left their sight from the moment it drove from the residence until the car stop occurred a short distance away.

There is no basis for drawing a "bright line" test under *Summers* at the residence's curb and finding that the authority to detain under *Summers* always dissipates once the occupant of the residence drives away. If such a rule were adopted it would require police officers who want to detain an exiting occupant of a residence under *Summers*, to effectuate the detention in open view outside the residence that was about to be searched, thereby subjecting them to additional dangers during the execution of the search, and potentially frustrating the whole purpose of the search due to destruction of evidence in the residence. Specifically, such an action could jeopardize the search or endanger the lives of the officers about to conduct the search by allowing any other occupants inside the residence, who might see or hear the detention of the individual outside the residence as he was leaving, to have some time to (1) destroy or hide incriminating evidence just before the police are about to enter for the search; (2) flee through a back door or window; or (3) arm themselves in preparation for a violent confrontation with the police when they entered to conduct the search. Neither the Constitution nor Supreme Court or Second Circuit precedent demands such a peculiar result.

5

Under the circumstances of this case, because the detectives certainly had the legal authority to immediately detain Bailey under *Summers* when he left the residence and entered a car, they possessed that same authority to detain him approximately five minutes later after following him a short distance away from the residence for safety reasons, and then to transport him back to the scene of the search. The Court credits the detectives' testimony and finds that the detention pursuant to *Summers* took place at the earliest practicable location that was consistent with the safety and security of the officers and the public.

In addition to the Second Circuit's holding in *Fullwood*, other circuit courts have reached similar conclusions on facts even more closely analogous to the facts of this case. For example, in *United States v. Cochran*, 939 F.2d 337, 338 (6th Cir. 1991), the police officers went to the defendant's residence to execute a search warrant and, prior to the search, defendant left his residence in his car, and was permitted to travel a short distance before the police stopped him. The Sixth Circuit found that the stop was lawful as a detention pursuant to the execution of the search warrant. Specifically, the Sixth Circuit refused to distinguish *Summers* notwithstanding the fact that the defendant was not stopped until after he left the residence in his vehicle:

> Defendant does not dispute the holding in *Summers*, but attempts to factually distinguish it from the instant case. In *Summers*, police stopped the individual as he was "descending the front steps." In contrast here, police stopped defendant after he had driven a short distance from his home. We do not find this distinction significant, however. *Summers* does not impose upon police a duty based on geographic proximity (*i.e.*, defendant must be detained while still on premises); rather, the focus is upon police performance, that is, whether the police detained defendant as soon as practicable after departing from his residence. Of course, the performance-based duty will normally, but not necessarily, result in detention of an individual in close proximity to his residence.

*Id.* at 339 (citations omitted); *see also United States v. Sears,* 139 Fed.Appx. 162, at *3 (11th Cir.) (detention under *Summers* was proper where individual left house about to be searched and police waited until individual drove about 100 feet from house in a vehicle before detaining him during execution of search) *cert denied*, 128 S. Ct. 504 (2005); *United States v. Cavazos*, 288 F.3d 706, 711 (5th Cir. 2002) (detention of occupant of residence, after he left residence about to be searched and drove two blocks in a car, was proper under *Summers*); *United States v. Harris*, No. Crim. 02-10240-GAO, 2004 WL 912809, at *1 (D. Mass. April 26, 2004) (defendant properly detained under *Summers* after he left his home and walked one or two dogs to adjacent yard about 30 yards from his house). The Court finds these cases to be persuasive and consistent with the logic of both *Summers* and *Fullwood*. As the Supreme Court has emphasized, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the

seizure.'"[4]  *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19).

Moreover, "[i]nherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler,* 544 U.S. at 98-99. Thus, once an officer has authority to detain under *Summers*, it is beyond cavil that the officer also has the authority to conduct a pat-down of the individual and place the individual in handcuffs where legitimate safety concerns warrant such actions. *See Muehler*, 544 U.S. at 99-100 (officers acted reasonably by detaining occupant in handcuffs for two to three hours during execution of search where weapons were sought); *Fullwood*, 86 F.3d at 30 (during lawful detention pursuant to search of residence "[i]t was also prudent for the officers to handcuff [the resident] until they could be certain that the situation was safe"); *United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (search of handbag of woman who had entered an apartment being searched, along with individuals known to be involved in drug transactions in the apartment, constituted a lawful "minimal intrusion"); *see also Rivera v. United States*, 928 F.2d at 606 (police, when detaining occupant of premises

---

[4] Some circuit courts, however, have declined to extend *Summers* to such detentions once the occupant of the residence has left the search scene. *See, e.g., United States v. Edwards*, 103 F.3d 90, 93-94 (10th Cir. 1996) (refusing to apply *Summers* where defendant was stopped in his car, three blocks after leaving residence about to be searched, and detained for 45 minutes even though police had no reason to believe defendant, prior to the stop, was aware of imminent search of residence); *United States v. Sherrill*, 27 F.3d 344, 345-46 (8th Cir. 1994) (refusing to apply *Summers* to a defendant who had driven one block from residence about to be searched and police had "no interest in preventing flight or minimizing the search's risk because [the defendant] had left the area of the search and was unaware of the warrant"). The Court disagrees with the analysis in these cases and believes that they place too much emphasis on the issue of whether the individual leaving the area was aware that a search warrant was about to be executed. Neither *Summers* nor *Fullwood* stands for the proposition that the person leaving the search site must be aware that law enforcement is about to enter the premises in order to be lawfully detained pursuant to the warrant. Even if the individual leaving is unaware of the warrant or the imminent search, the Supreme Court recognized in *Summers* that there is a legitimate law enforcement interest in detaining the individual briefly so that, among other things, law enforcement will not have to try to re-locate that individual again if probable cause to arrest is established a short time later based on the results of the search. *Summers*, 452 U.S. at 705-06 ("Because it was lawful to require [the occupant] to re-enter and to remain in the house until evidence establishing probable cause to arrest him was found, his arrest and the search incident thereto were constitutionally permissible."). Therefore, without requiring knowledge or suspicion of the warrant by the exiting individual, *Summers* specifically stated that law enforcement has a legitimate reason to detain the person solely because they are leaving a residence that is about to be searched. *See Summers*, 452 U.S. at 703-04 ("The connection of an occupant to [the home subject to the search] gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant."). As noted above, the holding and rationale of both *Summers* and *Fullwood* apply with equal force when, for officer safety reasons, police do not detain the occupant on the curbside, but rather wait for him to leave the immediate area and detain him as soon as practicable.

7

during search, "have the authority to make a limited search of an individual on those premises as a self-protective measure"). Here, the Court concludes it was proper for the detectives to pat Bailey down outside the vehicle and place him in handcuffs while transporting him and detaining him during the execution of the search at the residence, particularly where the search of the residence was for a handgun.[5]

In short, the stop and detention of Bailey during the execution of the search was entirely proper under *Summers*. He was not detained as he left the search site for legitimate safety reasons, but instead was followed for approximately five minutes and then detained at the first location where the detectives determined they could safely detain him. There is absolutely no evidence that, in delaying the detention until he left the area, the detectives were manipulating the situation; rather, their conduct is completely consistent with concerns for officer safety. Moreover, in total, only approximately ten minutes elapsed from the time of the stop until the gun and drugs were found in the apartment and Bailey was placed under arrest. Under such circumstances, the stop and detention were lawful under *Summers*.[6]

2. Investigative Detention Pursuant to *Terry*

Even if there was no authority for the detention under *Summers*, the Court finds that the stop of the defendant's car and brief detention during the search were supported by

---

[5] Although Bailey relies on *Ybarra v. Illinois*, 444 U.S. 85 (1979) in support of his motion, that case is plainly distinguishable from the facts here. In *Ybarra*, the Court found that a pat-down of every person in a public bar pursuant to a search warrant for the bar was improper without any showing of a special connection to the premises or any reason to believe a person was armed. The *Ybarra* holding simply does not apply to a situation, as in the instant case, where the search warrant relates to a private residence where both the Supreme Court and Second Circuit have found detention and pat-down of the occupants, regardless of individualized suspicion, to be appropriate. *See Jaramillo,* 25 F.3d at 1152-53 (distinguishing *Ybarra* "which involved the search of an unsuspicious person in a public tavern, rather than the . . . *Michigan v. Summers* and *United States v. Barlin* line of cases, which involved detentions or pat downs in connection with permissible searches of private homes") (citations omitted).

[6] At the suppression hearing, Bailey's counsel also argued that, because the officers did not physically see Bailey leave the basement apartment door at the bottom of a staircase on the side of the house, but rather observed Bailey emerge from the gated area containing a staircase leading to the door to the basement apartment, the detectives could not say they saw Bailey leave the apartment door and, thus, *Summers* does not apply. The Court finds this argument to be without merit because this factual distinction is of no consequence given the layout of the residence at 103 Lake Drive. More specifically, the Government unequivocally established at the hearing, through photographs and testimony, that the staircase leading to the basement apartment was fully enclosed by a small gated area at the top of the steps (measuring about four feet by six feet) such that, once inside the gate, the only place one could access was the basement apartment. In other words, the gated area was completely separate from the backyard and there was nothing in that small gated area other than a staircase leading to the basement apartment. (Tr. 5-13; Exs. 3-11.) Thus, when the detectives observed Bailey emerge from the gated area, the only place that he could have come from was the basement apartment. Under such circumstances, there was a sufficient factual basis to trigger a lawful detention of Bailey under *Summers* during the execution of the search.

8

reasonable suspicion and were lawful under *Terry*. As set forth below, the detectives had a sufficient factual basis – including the fact that Bailey exited the search location and matched the general description provided by the confidential informant – to stop the vehicle. Moreover, that initial information, which was bolstered by Bailey's statement during the stop that 103 Lake Drive was his residence, the other occupant's statement confirming that, and the information on his driver's license, provided more than a sufficient factual basis under *Terry* to transport Bailey a short distance back to his residence and briefly detain him during the search.

It is well-settled that, in determining whether an investigative stop is reasonable under the Fourth Amendment, the court must analyze "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) (quoting *Terry*, 392 U.S. at 20). Under the first prong of this analysis, "an investigative stop does not comport with the requirements of the Fourth Amendment unless 'specific articulable facts, together with rational inferences from those facts, [ ] reasonably warrant suspicion' that the individual stopped was engaged in criminal activity." *Alexander*, 907 F.2d at 272 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)); *accord United States v. Colon,* 250 F.3d 130, 134 (2d Cir. 2001); *United States v. Jaramillo*, 25 F.3d 1146, 1150 (2d Cir. 1994). In determining whether a *Terry* stop was supported by resaonable suspicion, a court must consider the totality of the circumstances "'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quoting *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977)). Moreover, "[i]n connection with such a stop, the officer may 'tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'" *Jaramillo*, 25 F.3d at 1150-51 (quoting *Terry v. Ohio*, 392 U.S. at 23); *see also Colon,* 250 F.3d at 134 ("The investigating officer may also frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous."); *Alexander*, 907 F.2d at 273 (in traffic stop of suspected narcotics traffickers, officers were reasonable in deciding to unholster their guns and frisk the occupant of the car).

Here, based on the fact that Bailey left the basement apartment which was about to be searched and (along with the other occupant of the car) matched the general description (*i.e.*, build, hair type, and race) of the individual whom the confidential informant had identified as the drug trafficker, the detectives had specific and articulable facts that supported the investigative stop and brief detention during the execution of the search at the residence.[7] *See, e.g., United States v.*

---

[7] Moreover, although there was sufficient basis for the detention during the execution of the search at the residence under *Terry* even prior to the stop, the detectives learned more during the stop that provided additional basis for the temporary detention during the execution of the search. In particular, after stopping Bailey, the detectives learned from Bailey (and the other occupant) that 103 Lake Drive was Bailey's residence and Detective Sneider saw that Bailey's driver's license indicated an address in Bayshore (not Wyandanch), which is the town in which the informant said that the trafficker he dealt with had

*Henderson*, 645 F.2d 627, 628-29 (8th Cir. 1981) (stop of defendant two or three miles after he left residence about to be searched was lawful under *Terry*); *United States v. Willis*, No. 05-CR-6123L, 2006 WL 2239738, at *5 (W.D.N.Y. Aug. 4, 2006) (lawful under *Terry* to detain individual about to enter house being searched, to escort him a short distance from his parked car into the house, and to handcuff him during the search)

Although Bailey argues that the informant's general description and Bailey's exiting the basement apartment area were insufficient justification for the stop, the Second Circuit has specifically held otherwise. In *Jaramillo*, the Second Circuit stated that "[c]ircumstances giving rise to sufficiently 'specific and articulable facts' to warrant the stop and patdown of an individual" includes "an individual's ownership or occupancy of private premises for which a search warrant has been obtained." *Jaramillo*, 25 F.3d at 1151 (citing *Summers*). Similarly, in *United States v. Salazar*, 945 F.2d 47 (2d Cir. 1991), the Second Circuit upheld the pat-down search of an individual who, among other things, matched the informant's general description of the narcotics dealer and the individual entered the premises from which the informant said that drugs were being distributed. *Id.* at 50-51.

In addition, given that the detectives were searching for a gun at the residence and Bailey came from that residence, they were justified under *Terry* in patting down Bailey during the stop and handcuffing him while he was being transported back to the residence and briefly detained during the execution of the search.[8] This conduct by the detectives did not transform the situation into a *de facto* arrest. As the Second Circuit has emphasized, "where an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir.) (quoting *Terry v. Ohio*, 392 U.S. at 24) *cert denied*,

---

resided at some earlier point in time. Thus, this questioning during the stop provided additional specific and articulable facts that supported a brief detention (including transport back to the search site) under *Terry* during the execution of the search. Whether the detectives had already decided to detain the occupants of the car under *Summers* even prior to the questioning regardless of Bailey's answers is irrelevant to this determination because it is well-settled that the officer's subjective intent is not relevant on such an issue. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); *Bayless*, 201 F.3d at 133 (2d Cir. 2000) ("Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant."); *see also United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) ("the officers' subjective intent does not calcuate into the analysis" in determing if an investigatory stop ripened into an arrest).

[8] The cases which allow such restraints under *Summers* apply with equal force even when conducting the analysis under *Terry*. In other words, even assuming the detectives needed reasonable suspicion under *Terry* to stop Bailey in his car and detain him during the search, the same restraints that have been allowed under *Summers* would also be permitted under *Terry* once there are sufficient specific and articulable facts present to justify the *Terry* investigative detention.

543 U.S. 947 (2004). The Second Circuit further explained that "[t]his doctrine has supported a range of restraints incident to a stop, from the pat-down at issue in *Terry*, . . . to the drawing of firearms, . . . to the use of handcuffs." *Id*. (citations omitted). Specifically, in *Newton*, the Court found that it was reasonable under the Fourth Amendment for six officers to go to an apartment being searched and handcuff the occupant during the search of the apartment for a firearm. *Id*. at 675. As in *Newton*, the pat-down and handcuffing of Bailey during his transport back to the residence during the execution of the search was resaonable under the circumstances and did not violate the Fourth Amendment.

Moreover, under the particular circumstances of this case, the fact that Bailey was escorted a short distance back to his home in a patrol car pending the outcome of the search does not convert this investigative detention into an arrest that requires probable cause. *See United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000) ("[i]t is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop"); *United States v. Charley*, 396 F.3d 1074, 1080 (9th Cir. 2005) ("police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention given the specific circumstances of the case") (internal quotations and citations omitted); *see also Gallegos v. City of Los Angeles,* 308 F.3d 987, 990-93 (9th Cir. 2002) (valid investigative stop where police officers pulled over a man they mistakenly believed to be a burglary suspect, ordered him out of his vehicle at gunpoint, handcuffed him, placed him in the back of their patrol car, and brought him back to the scene of the incident for identification); *Halvorsen v. Baird*, 146 F.3d 680, 684-85 (9th Cir. 1998) (evidence supported finding that *Terry* stop did not become an arrest where officers handcuffed suspect and drove him to a nearby gas station for questioning); *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (holding that defendant's stop was "not tantamount to an arrest" even though "the officers drew their weapons, asked [the defendant] to accompany them [back to the crime scene] in one of their cars," and kept him in the officer's vehicle for over an hour); *United States v. Blackman*, 66 F.3d 1572, 1576-77 (11th Cir. 1995) (no arrest where FBI agents surrounded apartment, ordered suspects to come with their hands up, and handcuffed them).

As the Supreme Court has recognized, "there are undoubtedly reasons of safety and security that could justify moving a suspect from one location to another during an investigatory detention." *Florida v. Royer,* 460 U.S. 491, 504-05 (1983); *see also Halvorsen*, 146 F.3d at 685 ("[m]oving a suspect from one location to another does not automatically turn a detention into an arrest, where reasons for safety and security justify moving the person"); 4 Wayne R. LaFave, *Search and Seizure*, § 9.2(g) at 348 (4th ed. 2004) ("it seems clear that some movement of the suspect in the general vicinity of the stop is permissible without converting what would otherwise be a temporary seizure into an arrest"). Here, for both security and safety reasons, it was reasonable for the detectives to transport Bailey a short distance back to the search site, rather than remain in front of the firehouse during the execution of the search.

Accordingly, even assuming the detention was not authorized under *Summers*, the Court concludes that these facts were sufficient under *Terry* to provide a specific and articulable suspicion justifying Bailey's stop

11

and brief detention for approximately ten minutes during the search of the residence and Bailey's seizure did not equate to a *de facto* arrest under the Fourth Amendment.

B. Bailey's Statements During Detention

Bailey argues that, even if the stop was lawful, statements that he made during the stop must be suppressed because they were obtained without providing him with *Miranda* warnings. Although the Government argues that, because the detectives were authorized under *Summers* to detain him, they were also authorized to ask Bailey questions regarding his identity and address. However, the Second Circuit has made clear that the issue about whether an investigatory stop is reasonable under the Fourth Amendment is separate from whether the seized suspect is "in custody" for purposes of *Miranda*. More specifically, in *United States v. Ali*, 68 F.3d 1468 (2d Cir. 1995), the Second Circuit stated that "whether [a] 'stop' was permissible under *Terry v. Ohio* . . . is irrelevant to the *Miranda* analysis. *Terry* is an 'exception' to the Fourth Amendment probable cause requirement, not to the Fifth Amendment protections against self-incrimination." *Id.* at 1473. Moreover, the Second Circuit has applied this same analysis in considering statements made while an individual is detained during the execution of a search pursuant to *Summers*. *See Newton*, 369 F.3d at 673 (in examining *Miranda* issues, "instead of asking whether the degree of restraint was reasonable, we have focused on 'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'") (quoting *Ali*, 68 F.3d at 1472).

Thus, in the instant case, the lawfulness of Bailey's initial stop and detention during the search does not end the inquiry. The Court must also analyze whether the statements made by Bailey during the stop without *Miranda* warnings were proper. There are two sets of statements at issue: (1) Bailey identifying himself and stating he had come from his house at 103 Lake Drive (which was the site of the search); and (2) after asking why he was being arrested and being told that he was not under arrest but that a search was taking place at 103 Lake Drive, Bailey stated that he was not cooperating, he did not reside at that address, and that anything found there was not his. In particular, as set forth below, the threshold question is whether Bailey was "in custody" for purposes of *Miranda* at the time any of these statements were made.

It is well-settled that *Miranda* warnings only apply to "custodial interrogation." *Miranda*, 384 U.S. at 444; *accord Thompson v. Keohane*, 516 U.S. 99, 102 (1995); *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003). In *Newton*, which (as noted earlier) dealt with statements by a handcuffed parolee while his residence was being searched, the Second Circuit clarified the test for determining whether a person is in custody for purposes of *Miranda*. 369 F.3d at 669-70. Two tests had been discussed in prior Second Circuit cases. *See United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (utilizing the "coercive pressures" test for custody in which *Miranda*'s "in custody" requirement is met if questioning was "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak"); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998) (utilizing the "free to leave" test in which "[t]he test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have

understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave"). In *Newton*, the Second Circuit explained how these two prior cases were not "at odds" with each other:

> We take this opportunity to clarify how the free-to-leave test referenced in *Tankleff* and the coercive-pressures test articulated in *Morales* both serve to identify circumstances requiring *Miranda* warnings. The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody. The "ultimate inquiry" for determining *Miranda* custody, however, is that articulated by the Supreme Court in *California v. Beheler*: "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." [internal quotations and citations omitted]. . . . In such cases – i.e., where a person formerly at liberty is subjected to formal arrest or arrest-like restraints – specific coercive pressures need not be proved to establish *Miranda* custody; rather, coercive pressures are presumed from the fact of such custody.

369 F.3d at 670 (quotations and citations omitted). The Court emphasized that "although coercive pressure is *Miranda*'s underlying concern, custody remains the touchstone for application of its warning requirement." *Id*. at 671. Thus, "[t]he test for custody is an objective one: 'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'" *Id*. (quoting *Ali*, 68 F.3d at 1472 (internal quotation marks omitted)).

### (1) Bailey's Initial Statement Regarding His Name and 103 Lake Drive

The Court will first examine the statement Bailey made, prior to being handcuffed, regarding his name and the location he had just left.[9] As to the initial inquiry under the

---

[9] As to names and addresses, the Court recognizes that, independent of the "custody" issue, routine questions "reasonably related to the police's administrative concerns" do not constitute interrogation for *Miranda* purposes and, thus, do not require *Miranda* warnings. *Pennsylvania v. Muniz*, 496 U.S. 582 (1990); *see also Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, 542 U.S. 177, 191 (2004) ("Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances."); *United States v. Lockett,* 393 F.3d 834, 837 (8th Cir. 2005) ("[i]nterrogation does not generally include routine processing-type questions such as the name and address of a suspect") (quotations and citations omitted); *United States v. Edwards*, 885 F.2d 377, 385 (7th Cir. 1989) ("police routinely ask people for their names and addresses in nonarrest situations – in order to ascertain the identity and residence of witnesses, as well as to dispel (or confirm) suspicions aroused by unusual behavior – where it is clear that *Miranda* warnings are not required, although such inquires might in fact confirm a police officer's suspicions sufficiently to give rise to probable cause to arrest"). Moreover, the D.C. Circuit has found that questioning an occupant of a house during a search about his address and ownership of the residence does not implicate *Miranda* because it satisfies the administrative concern about serving a copy of the warrant on the owner of a house. *See United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004).

13

"in custody" test, the Court finds that, when Bailey was pulled over by the police and asked to exit his vehicle, a reasonable person in his position would believe under such circumstances that they were not free to leave at that point. However, that does not end the "in custody" test for *Miranda* purposes. *See Cruz v. Miller*, 255 F.3d 77, 84 (2d Cir. 2001) (noting that the Supreme Court has "acknowledged that the motorist did not feel free to leave, yet could be questioned without *Miranda* warnings") (citation omitted). The Court must consider whether a reasonable person would have understood himself to be subjected to restraints comparable to those associated with a formal arrest.

After carefully considering all of the facts, the Court finds that a reasonable person in Bailey's situation, at the time he made the statement about 103 Lake Drive being his house, would not have had the belief that he or she was being subjected to the restraints associated with formal arrest. More specifically, at the time he made the statement, Bailey was not handcuffed and no guns were drawn. Moreover, he was not even told at that juncture that he was going to be detained during the pendency of the search. The fact that he was asked to exit the vehicle and patted down does not transform what would appear to a reasonable person in defendant's situation to be a routine investigative stop into a custodial situation for *Miranda* purposes. *See Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (the nonthreatening character of *Terry* stops "explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*"); *see also Pennsylvania v. Bruder*, 488 U.S. 9, 11 (1988). In fact, courts have found *Miranda* not to be implicated in situations involving far more intrusive actions by police during investigative stops, for safety reasons. *See Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) ("Several courts have ruled that an initial display of guns, subsequently reholstered, does not result in 'custody' that

---

However, in the instant case, the Court finds that the detectives' questioning of Bailey went beyond any administrative concerns and, the detectives' questions, including asking where Bailey had just left from, would implicate *Miranda* if Bailey is found to be "in custody" for *Miranda* purposes. *See Hiibel*, 542 U.S. at 191 ("a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict that individual of a separate offense. In that case, the court can then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow.") The question was not a request for an address for booking purposes or some other routine traffic stop reason; rather, where the detective had just seen Bailey leave the search location, he knew that Bailey's response to that question was likely to be incriminating. Similarly, the rationale in *Gaston* does not apply here because the detectives already knew where Bailey had come from before asking the question, and never even inquired about his actual address. Moreover, when he stated his lived at 103 Lake Drive, they asked no follow-up questions regarding his exact relationship with 103 Lake Drive – such as whether he lived in the main house or the basement apartment – as would be needed to serve a copy of the warrant on the resident. Under these circumstances, there is no basis for believing that the questioning could reasonably be related to serving a copy of the warrant on the owner of the premises and the Government did not even advance that argument at the suppression hearing. Thus, under such circumstances, the Court must analyze whether Bailey was "in custody" for *Miranda* purposes at the time he made the statement regarding his identity and that he had just come from 103 Lake Drive, which was his home.

14

requires *Miranda* warnings.") (collecting cases); *see also United States v. Leshuk,* 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes"). Under the factual circumstances in this case, no reasonable person in Bailey's situation would believe that he or she was being subject to restraints equivalent to a formal arrest.[10]

At oral argument, Bailey argued that a belief he was under arrest was reasonable because he was not being stopped due to a traffic violation or some other violation of the law. The Court finds that argument to be without merit. The mere fact that an individual is pulled over even though such person did not commit a traffic infraction does not mean he or she would be reasonable to assume that he or she was under arrest or subject to restraints similar to arrest. Indeed, the Supreme Court has analogized *Terry* stops with traffic stops for purposes of conducting the "in custody" analysis under *Miranda*. *See Berkemer*, 468 U.S. at 440 n.29 ("most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized under *Terry*"). Therefore, the lack of a traffic infraction did not transform this stop, at the time of questioning, into a *Miranda* event.

In sum, the Court concludes that this stop under *Summers* pursuant to a lawful search of the residence (or as an investigatory stop under *Terry*), did not rise to the level of *Miranda* custody at the time of Bailey's statement about his name and the location from which he had come from and, thus, the motion to suppress those statements is denied.

(2) Bailey's Statement After Being Handcuffed

The Court will now turn to Bailey's statement after being handcuffed. The Court finds that, once the officer placed the handcuffs on Bailey, he was "in custody" for *Miranda* purposes, even though he was not under formal arrest. As the Second Circuit has noted, "[h]andcuffs are generally recognized as a hallmark of a formal arrest." *Newton*, 369 F.3d at 676; *see also N.Y. v. Quarles*, 467 U.S. 649, 655 (1984) (holding that handcuffed defendant was in custody for purposes of *Miranda*); *Dunaway v. N.Y.*, 442 U.S. 200, 215 & n.17 (1979) (listing handcuffs as a "trapping[] of a technical formal arrest"). In the instant case, upon being handcuffed, a person in Bailey's situation would reasonably conclude "that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police – in other words, that he was restrained to a degree normally associated with formal arrest and, therefore, in custody." *Newton*, 369 F.3d at 676.

The Court recognizes that, although handcuffing Bailey, the detectives specifically advised Bailey that he was not being placed under arrest. However, under the circumstances of this case, that caution by the officers does not change the analysis. In fact, this is precisely what occurred in *Newton* where the Second Circuit found that, even when the individual being detained during the search warrant execution was told that he was not under arrest and was being handcuffed only for his own safety and the safety of the

---

[10] These facts distinguish the situation from the parolee in *Newton* who, prior to questioning, was detained and handcuffed pursuant to a search of his mother's apartment.

15

officers, the person was "in custody" for *Miranda* purposes:

> Having considered all the circumstances presented here, we conclude that a reasonable person would have understood that his interrogation was being conducted pursuant to arrest-like restraints. Although a reasonable person told, as Newton was, that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station – a significant factor in assessing the degree to which one is at the mercy of authorities,. . .– a reasonable person would also have understood that as long as the handcuffs remained in place, his freedom of movement, even within his home, would be restricted to a degree comparable to that of an individual placed under formal arrest. The record does not indicate whether Newton was told that the specific reason for a safety concern in his case was that the officers were searching for a gun. Thus, we cannot assume that a reasonable person in his situation would have understood that the handcuffing would likely last only until the officers had completed their search. Neither can we assume an understanding that removal or maintenance of the handcuffs depended on the outcome of the search rather than on the suspect's responding to questions posed.

*Newton*, 369 F.3d at 677 (quotations and citations omitted). As in *Newton*, Bailey had no basis for knowing why the handcuffs were necessary or how long he would remain detained and handcuffed. A belief that his freedom of movement was being restricted to a degree comparable to formal arrest was further enhanced in the instant case because the handcuffing did not occur in Bailey's home, but rather took place on the street next to his vehicle after a car stop while he was being transported *back* to his home. Thus, this Court concludes that handcuffing Bailey, "though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of *Miranda*." *Id*. The Court, however, does not conclude that Bailey's statements following the handcuffing must be suppressed because, as set forth below, his statements were not in response to interrogation, which is a separate requirement for *Miranda* to be implicated.

It is well-settled that "interrogation" for *Miranda* purposes consists not only of "express questioning" but also its "functional equivalent" including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from a subject." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *accord United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987). In the instant case, Bailey's statements subsequent to being handcuffed – that he was not cooperating, that he does not live at 103 Lake Drive, and that anything found there was not his – were made spontaneously, and not in response to conduct by the detectives that amounted to interrogation or its functional equivalent. In fact, the statements occurred only when Bailey asked why he was being arrested and was told that he was not being arrested, but was being detained because 103 Lake Drive was being searched. It was only after Bailey was supplied with that information, in direct response to his own question, that he

16

spontaneously made the statements at issue. *Colon*, 835 F.2d at 30 (statement admissible where "[defendant] was not questioned, confronted with evidence, or even encouraged to be honest and tell the facts. [The defendant] initiated the conversation. . . .").

Under such circumstances, in simply answering Bailey's question about why he was being arrested, the detectives did nothing that was reasonably likely to elicit an incriminating response and the exchange was one normally attendant to custody – namely, explaining the basis for the custody. *See, e.g., United States v. Henderson*, 770 F.2d 724, 728 (8th Cir. 1985) ("When [defendant] initiated conversation by requesting that [the law enforcement officer] specify the charges, the ensuing verbal exchange was nothing more than a conversation 'normally attendant to arrest and custody'" and, thus, was not interrogation under *Miranda*) (quoting *Innis*, 446 U.S. at 300-01); *see also United States v. Fleck*, 413 F.3d 883, 892-93 (8th Cir. 2005) (police request for key to bedroom during search did not constitute interrogation for *Miranda* purposes); *United States v. Lockett*, 393 F.3d 834, 838 (8th Cir. 2005) (statements made after defendant asked why the police were in his apartment, and was told the reason, were not in response to interrogation); *United States v. Henry*, 940 F. Supp. 342, 346 (D.D.C. 1996) (officer's response to inquiry by defendant about what he was being charged with was not "interrogation" for purposes of *Miranda*). Thus, those spontaneous statements are admissible even in the absence of *Miranda* warnings.[11]

## C. Seizure of the Keys

The Court next examines whether the seizure of the keys during the car stop was proper. Detective Sneider testified that he removed Bailey's keys, including the key to his car and the residence, from Bailey's front left pocket during the pat-down search at the back of the car. (Tr. 56.) After the decision was made to transport Bailey and the other occupant of the car back to 103 Lake Drive in a patrol car, Detective Gorbecki took those keys to use them to transport Bailey's car to the search location. (Tr. 59.) Upon arriving back at the residence, the detectives learned of the discovery of the gun during the search, and placed Bailey under arrest. (Tr. 61.) Shortly thereafter, Detective Sneider tested one of the keys on the key ring in the door to the basement apartment at 103 Lake Drive and determined that it matched the lock. (Tr. 60.)

Bailey now argues that the seizure of the keys during the car stop violated the Fourth Amendment. The Government argues that the keys were properly removed during the pat-down search and that the subsequent seizure of the keys to transport Bailey's car was proper under the police's community care function. For the reasons set forth below, the Court finds that the seizure of the keys was lawful.

As a threshold matter, the Court concludes that the removal of the keys during the pat-down was proper.[12] As noted *supra*, the use

---

[11] The Court does not find any voluntariness issue as to Bailey's statements. There is no indication that his statements were anything other than the product of a "rational intellect and free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).

All the statements were made freely and without coercion.

[12] Bailey's counsel argued at the suppression hearing that the Court should not credit Detective Sneider's testimony that the car key was found in Bailey's pocket among other keys on a key ring. Rather, counsel argued that the Court should

17

of the pat-down during the stop was lawful to ensure officer safety and, after feeling a hard object in the pocket, the removal of the keys from the pocket was permissible to ascertain if there was a weapon in the pocket.[13] *See, e.g., United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993) (proper to reach into pocket and remove money clip during pat-down to determine if it was some type of weapon). The Court next turns to whether the subsequent seizure of the keys following the pat down to transport Bailey's vehicle was lawful.

The Supreme Court has repeatedly held that police may impound vehicles "[i]n the interests of public safety and as part of what the [Supreme] Court has called 'community caretaking functions.'" *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (quoting *Cady v. Dombrowski*, 413 U.S. 433 (1973). More specifically, "[p]olice officers may exercise their discretion in deciding whether to impound a vehicle, so long as that discretion is 'exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *United States v. Best,* 415 F. Supp. 2d 50, 53 (D. Conn. 2006) (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)).

It is well-established that, when a person is taken into custody after being stopped in his vehicle, it is reasonable for police officers to impound the vehicle under the community car functions where, among other things, the vehicle would otherwise potentially impede traffic, threaten public safety, or be subject to vandalism. *See United States v. Jensen*, 425 F.3d 698, 706 (9th Cir. 2005) ("Once the arrest was made, the [community caretaker] doctrine allowed law enforcement officers to seize and remove any vehicle which may impede traffic, threaten public safety, or be subject to vandalism.") *cert denied*, 126 S. Ct. 1664 (2006); *Hallstrom v. Garden City*, 991 F.2d 1473, 1477 n.4 (9th Cir. 1993) (impoundment of arrestee's car from private parking lot "to protect the car from vandalism or theft" was reasonable under the community caretaking function); *United States v. Rodriguez-Morales,* 929 F.2d 780, 785 (1st Cir. 1991) ("the police had a legitimate reason for stopping the car and a strong noninvestigatory justification for removing it from the highway") (collecting cases); *United States v. Johnson*, 734 F.2d 503, 504-05 (10th Cir. 1984) (reasonable to tow and impound vehicle lawfully parked in commercial parking lot following arrest of driver).

Although Bailey was not being placed under arrest, the "community care" function applies with equal force to the instant situation where his car was transported one mile back to the site of the search, where Bailey was going to be temporarily detained. Here, the detectives were confronted with a situation where they had stopped the vehicle in the Fire Department parking lot and were going to transport Bailey and the other occupant of the vehicle back to 103 Lake

---

conclude that the car key was a single key in the ignition. Counsel, in support of that argument, points to alleged inconsistencies in Detective Sneider's testimony and the vouchers for the keys. (Tr. 93-94.) The Court rejects this argument in its entirety and credits Detective Sneider's testimony that he found the keys (including the car key and the key to the residence) on a key ring in Bailey's pocket during the pat-down.

[13] Even if the keys were not properly removed as part of the pat-down search, the Court finds that Bailey's motion still fails because, as discussed below, the seizure of the keys was justified under the Fourth Amendment to transport his car back to the search location.

Drive during the execution of the search. Rather than leave the car in the Fire Department parking lot, the detectives decided to bring Bailey's car back to the residence at 103 Lake Drive for safekeeping. (Tr. 59.) As a result, Detective Gorbecki used Bailey's keys to drive the car back to 103 Lake Drive while a uniformed patrol car transported Bailey and the other occupant back to the residence. (Tr. 28, 81.) Detective Gorbecki testified that, in addition to taking the car back for safekeeping, they also did not want to leave the car in that parking lot where it was blocking the bay doors to the firehouse. (Tr. 41.) The Court also notes that, although Bailey was only being temporarily detained during the execution of the search, the detectives knew that such detention might potentially be transformed into an arrest, and more lengthy detention, depending on what was found during the search. Such variables further support the reasonableness of the detectives' decision. Moreover, in addition to having a solid, noninvestigatory rationale for the seizure of the keys and transport of the vehicle, the Court also concludes that there is absolutely no suggestion that the detectives' conduct was pretext for some investigatory purpose. In fact, the car was not searched in connection with the transport of the vehicle or at any time prior to Bailey's arrest after returning to the search location. (Tr. 62-63.) Similarly, Detective Sneider did not seize Bailey's wallet after the pat-down search, but rather returned it to his pocket. (Tr. 59.)

To the extent that Bailey suggested, during questioning of the detectives at the hearing, that the car did not need to be moved at all because it was in a well-lit, safe firehouse parking lot, the Court rejects that argument. As noted above, in addition to safekeeping the car, the detectives also were concerned about not creating a public hazard by allowing the car to remain in the firehouse parking lot where it was blocking the firehouse doors. There is no indication whether there was another safe area in the immediate vicinity of the firehouse to which the car could be moved. However, even if there was another safe area, the decision to alleviate this problem by transporting the car back to the residence, which was only one mile away and was the same location to which Bailey was being transported, was certainly reasonable under the circumstances. As the First Circuit has recognized:

> [T]he existence of alternative means of dealing with the automobile, even less intrusive means, does not illegitimate the constables' decision to impound it. When a motor vehicle is left without a licensed driver in the course of a lawful highway stop, the Constitution only requires the police to act reasonably with regard to disposition of the vehicle. There is no requirement that the officers must select the least intrusive way of fulfilling their community caretaking responsibilities.

*Rodriguez-Morales*, 929 F.2d at 786.

In sum, the detectives' decision to transport the car back to 103 Lake Drive was reasonable under their community caretaking functions and, thus, the seizure of Bailey's keys to effectuate the transport was proper. Of course, once Bailey was transported back to the residence and then placed under arrest when the firearm was found in the residence, the keys (including the key to the residence) could be kept incident to Bailey's arrest. *See United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993) (where an individual is arrested in a location other than his home, "the arresting

officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area") (quotations and citations omitted). Accordingly, the motion to suppress the keys is denied.[14]

---

[14] Even if the car was improperly transported and the keys improperly seized, suppression would still not be warranted under the inevitable discovery doctrine. More specifically, if the detectives had detained Bailey at the side of the road during the search of the residence and not searched him or transported him, he would have been placed under arrest after the results of the search were complete and the key to the residence would have inevitably been discovered and been properly seized incident to that arrest. *See Perea*, 986 F.2d at 644 (suppression would be unwarranted where evidence "would inevitably have been discovered as part of a valid inventory search . . . subsequent to [a] lawful arrest").

## III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress is DENIED.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 6, 2006
Central Islip, NY

\* \* \*

The attorney for the government is Charles P. Kelly, Esq., Assistant United States Attorney, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, One Pierrepont Plaza, Brooklyn, New York 11201. The attorney on the brief for the defendant was Michael D. Weil, Esq., Leonard F. Joy, Esq., Federal Defenders of New York, 460 Federal Plaza, Central Islip, New York, 11722. The attorneys for the defendant at oral argument were Joseph Conway, Esq., and Nancy Valery, Esq., LaRusso & Conway, Attorneys at Law, 145 Willis Avenue, Mineola, New York 11501.